TE–MOAK BANDS OF WESTERN SHO-SHONE INDIANS OF NEVADA, suing on Behalf of the WESTERN SHO-SHONE NATION OF INDIANS, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 326–A.

United States Claims Court.

Sept. 18, 1989.

Frances L. Horn, Washington, D.C., for plaintiffs.

James M. Upton, with whom was Asst. Atty. Gen. Roger J. Marzulla, for defendant.

Thomas C. Luebben, Albuquerque, N.M., for proposed intervenors.

## ORDER

SMITH, Chief Judge.

This action concerns a motion to intervene by three Indian tribes: The Timbisha Shoshones, the Duckwater Shoshones, and the Yomba Shoshones. These tribes allege that their interests in the case at bar are not adequately represented by the Te-Moak Bands of Western Shoshone Indians. Defendant objects to this motion for intervention; therefore, this motion is made under Rule 24(a) of the Rules of the United States Claims Court (RUSCC) as a matter of right. For the reasons set forth below, the court must deny the motion for intervention.[1]

## FACTS

The history of this case began in 1951 when all of the Shoshone Indian tribes filed a joint petition with the Indian Claims Commission (Commission). One particular claim within the joint petition brought by the Te-Moak Bands on behalf of the Western Shoshones was for compensation for lost California and Nevada lands, allegedly taken by the United States in the latter part of the 19th century. The joint petition also requested relief and a general accounting for defendant's alleged misuse of funds and proceeds held exclusively by defendant on behalf of the Shoshones.

All of the Shoshone claims proceeded under docket number 326, until 1957. At that time, all of the general accounting claims were severed from the original petition into separate causes of action for each recognized group of Shoshone Indians. The general accounting claim by the Te-Moak Bands on behalf of the Western Shoshones was filed separately under docket number 326-A. All of the Shoshone tribes jointly continued with their taking claims, however, under docket number 326, throughout the early 1960s.

### I. The Taking Claim

On October 16, 1962, the Indian Claims Commission found that the Shoshone lands, in effect, had been taken by the United States when settlers and other nonnative Americans gradually encroached upon the aboriginal title held by the Shoshones. *Shoshone Indians v. United States*, 11

---

1. The proposed intervenors also have put forward an oral motion requesting that this court suspend its decision if it intends to rule against their motion. This oral motion must be rejected as well.

Ind.Cl.Comm. 387 (1962). No taking date for the Nevada lands had been established by the Commission in its decision, but both parties later stipulated this date to be July 1, 1872. *Te–Moak Bands of W. Shoshone Indians ex rel. W. Shoshone Nation v. United States*, 29 Ind.Cl.Comm. 5 (1972).

The Commission also found that the Western Shoshones were separate from the other Shoshones and that the Te–Moak Bands were representative of the Western Shoshones. *Id.* at 446. The Commission therefore required the Te–Moak Bands to file a separate amended petition on behalf of the Western Shoshones. This amended petition was docketed under number 326–K.

In 1972, the Commission determined the values of the property taken. The Commission valued the California land at $200,-000.00 as of March 1853, and valued the Nevada land excluding the value of the minerals extracted, at $21,350,000.00 as of July 1, 1872. The value of the minerals extracted from the Nevada land was found to be worth $4,604,000.00 as of that date.

A separate group of Western Shoshone Indians called the Western Shoshone Legal Defense and Education Fund Association (the Association), a group not formally recognized by the federal government, tried to enter the case in 1972. By motion, the Association contended that its lands never were taken. It attempted to repudiate all sums that the Commission found owing to the Western Shoshones, and argued that its constituents still held legal title to the property. Their motion was dismissed as untimely. *Western Shoshone Legal Defense & Educ. Ass'n*, 35 Ind.Cl.Comm. 457 (1975), *aff'd*, 209 Ct.Cl. 43, 531 F.2d 495, *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976).

The Te–Moak Bands then changed their legal position. Instead of claiming that a taking had occurred and that just compensation was due, the Te–Moak Bands switched to the position held by the Association and argued that title to the lands in question never had been lost. Accordingly, the Te–Moak Bands asked for a stay of the Commission's final award pending a response by the Secretary of the Interior. This stay was denied and the Commission entered judgment on August 15, 1977. *Te–Moak Bands of W. Shoshone Indians ex rel. W. Shoshone Nation*, 40 Ind.Cl.Comm. 318 (1977), *aff'd*, 219 Ct.Cl. 346, 593 F.2d 994, *cert. denied*, 444 U.S. 973, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979).

This left the Western Shoshones with an award of $26,145,189.89 after offsets.[2] This award was certified by the Clerk of the Court of Claims to the General Accounting Office (GAO) on December 6, 1979. *United States v. Dann*, 470 U.S. 39, 43–44, 105 S.Ct. 1058, 1061–62, 84 L.Ed.2d 28 (1985). At that time, the case was closed except for the issue of attorney's fees.[3] Litigation for attorney's fees finally was completed on June 3, 1981. *Id.*

Currently, the monetary award for the taken land is being held by the United States Department of the Treasury in an interest-bearing trust fund. The sum has accrued interest; as of 1984, this sum equalled approximately $43 million. *Dann*, 470 U.S. at 43, 105 S.Ct. at 1061. The Secretary of the Interior is required to submit a plan to Congress for distribution of the funds to the Western Shoshones but has not acted as of the date of this motion.

## II. The Accounting Claim

The Te–Moak Bands' general accounting claim has moved at a slower pace than the taking claim; there was no activity on the general accounting claim until 1967, sixteen years after the original claim was filed in 1951 and ten years after the general accounting claim was ordered severed from the original joint petition.

---

**2.** The offset phase of the Western Shoshones' claim was resolved in 1977 by the Commission. *Te–Moak Bands of W. Shoshone Indians ex rel. W. Shoshone Nation*, 40 Ind.Cl.Comm. at 318. In that decision, the Commission found that defendant was entitled to $9,410.11 in offsets against the earlier award of $26,154,600.00.

**3.** The final award constituted final judgment within the meaning of the Indian Claims Commission Act, ch. 959, § 22, 60 Stat. 1049, 1055 (1946), *repealed by* 90 Stat. 1990 (1976). *See Dann*, 470 U.S. 39, 105 S.Ct. 1058 *passim.*

Plaintiff filed an amended petition in 1967. The General Services Administration (GSA) later filed a report which included an accounting of two trust funds which originally were awarded to the Indians as a result of various treaties and legislative acts. The first trust fund was derived from the Treaty of Ruby Valley, 18 Stat. 689 (1863). The second trust fund, known as "Indian Moneys, Proceeds of Labor," was derived from the Act of March 3, 1883 (now codified at 25 U.S.C. § 155 (1982)). The GSA report contained the dates on which the funds were awarded and detailed how those funds were invested and disbursed.

Throughout the early 1970s, litigation progressed at the Commission on plaintiff's allegations of misuse and failure to account for certain items in both trusts. When the Commission was terminated on September 30, 1978, *see* 90 Stat. 1990 (1976), this case was transferred to the Court of Claims, which certified the Commission's award on December 6, 1979. When the Court of Claims became the Court of Appeals for the Federal Circuit and the Claims Court in 1982, the case was transferred to this court, where litigation continues on Te–Moak's general accounting claim as of this date. *See further Te–Moak Bands of W. Shoshone Indians ex rel. W. Shoshone Nation*, 18 Cl.Ct. 74 (1989).

Now, almost thirty-six years after this lawsuit's inception in 1951, three Western Shoshone tribes, the Timbisha Shoshones, the Duckwater Shoshones, and the Yomba Shoshones, have filed a motion to intervene in the general accounting claim under docket number 326–A. Defendant objects to the motion; the proposed intervenors, therefore, have filed their motion as a matter of right.

The proposed intervenors claim that their interests are not being adequately represented by the Te–Moak Bands. In particular, they object to the agreement in 1966 which stipulated that the Western Shoshones' land had been taken as of July 1, 1872. Relying on *Dann*, 470 U.S. at 43–44, 105 S.Ct. at 1061–62, the proposed intervenors argue that the land was never taken, or, at least, was not taken until December 6, 1979.[4] They are requesting rents, profits, and a variety of other revenue earned from the Nevada property at least through 1979.

## DISCUSSION

### I. Intervention as a Matter of Right

The proposed intervenors have brought their motion as a matter of right[5] in the face of defendant's objections.[6] *See generally* RUSCC 24(a). In order for the proposed intervenors to prevail on their motion as a matter of right, they must file a timely application and

claim[ ] an interest relating to the property or transaction which is the subject of the action and ... [be] so situated that the disposition of the action may as a practical matter impair or impede ... [the proposed intervenor's] ability to protect that interest, unless ... [their] interest is adequately represented by existing parties.

*Id.*[7]

### A. Timeliness

■ The central problem with this motion to intervene as a matter of right is that it is untimely. This motion for intervention comes thirty-six years after the initial complaint was filed, twenty-one years after both parties stipulated the date on which the title in question was extinguished, fifteen years after the valuation

---

4. As mentioned earlier, December 6, 1979, was the date on which the Court of Claims ordered the final award as just compensation for the lost California and Nevada lands.

5. The proposed intervenors also had an opportunity to present a motion for permissive intervention under RUSCC 24(b). Acceptance of this motion would have been within the discretion of the court.

6. Plaintiff has no objection to this intervention.

7. This second requirement may be waived if there is a "statute of the United States [which] confers an unconditional right [upon the intervenors] to intervene." RUSCC 24(a)(1). The proposed intervenors have failed to assert that any such statute is applicable in this case.

of the taken lands was decided, and eight years after the final award was entered.

■ The proposed intervenors, however, assert that they are subject to a more liberal standard because they are Indian claimants. This court does not agree. Claims by Indian tribes are subject to the timely application requirements of RUSCC 24(a) as is any other claim. *United States v. Alpine Land & Reservoir Co.*, 431 F.2d 763, 767 (9th Cir.1970), *cert. denied sub nom., Pyramid Lake Paiute Tribe v. United States*, 401 U.S. 909, 91 S.Ct. 869, 27 L.Ed.2d 807 (1971).

■ It is within the discretion of the court to decide which delays render motions untimely. *See, e.g., NAACP v. New York*, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973); *Reeves v. Wilkes*, 754 F.2d 965, 968 (11th Cir.1985). In exercising this discretion, the court must review all of the facts and circumstances of the delay within a three factor framework. *Ackley v. United States*, 12 Cl.Ct. 306, 308 (1987). These three factors are:

(1) the length of time during which the would-be intervenor actually knew or reasonably should have known of his right to intervene ...;

(2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor by denying intervention; [and]

(3) [the] existence of unusual circumstances militating either for or against a determination that the application is timely.

*Id.* (quoting *Cheyenne–Arapaho Tribes v. United States*, 1 Cl.Ct. 293, 295 (1983)). *Accord, e.g., Walters v. City of Atlanta*, 803 F.2d 1135, 1150 (11th Cir.1986); *Stallworth v. Monsanto*, 558 F.2d 257, 264, 266 (5th Cir.1977). When weighing these three factors, interventions of right should be treated more leniently than permissive interventions because denial of the former is more likely to result in serious harm. *Sid-*

*ney v. Zah*, 38 Fed.R.Serv.2d (Callaghan) 151, 152 (9th Cir.1983).

As stated earlier, the proposed intervenors' entrance in this case has been long delayed. They are attempting to undo the stipulation that stated the Nevada land had been taken as of July 1, 1872. That stipulation was agreed to in 1966, twenty-one years before this intervention was filed. In response, the proposed intervenors contend that they only questioned the validity of that Nevada stipulation when the Ninth Circuit in *United States v. Dann* found that the Nevada lands never had been taken. 572 F.2d 222, 226–27 (9th Cir.1978). Even if that decision had been determinative, however, it was rendered in 1978, nine years prior to this motion for intervention; no explanation of their further delay has been offered. This eight-year delay by the proposed intervenors is unacceptable. *See Ackley*, 12 Cl.Ct. at 308–09 (a delay of twelve years was held to be untimely); *Cheyenne–Arapaho Tribes*, 1 Cl.Ct. at 296 (a delay of seven years was held to be untimely).[8]

In weighing the possible prejudice to litigants and intervenors, the prejudice to the existing parties clearly is too great to grant the intervention. If this intervention is allowed, Te–Moak would be prejudiced by the further delay in the disbursement of the funds awarded in 1979. *See SEC v. Tipco, Inc.*, 554 F.2d 710, 710 (5th Cir.1977) (per curiam) (delay of a distribution of assets for claimants constituted prejudice). Moreover, both parties now would have to re-litigate the taking date agreed upon in 1966, which would involve the re-estimation of the value of the property established by the Commission in 1972. *Te–Moak Bands of W. Shoshone Indians ex rel. W. Shoshone Nation*, 29 Ind.Cl.Comm. 5. *See Cheyenne–Arapaho Tribes*, 1 Cl.Ct. at 296 (prejudice against existing parties where litigation is reopened).

Finally, the proposed intervenors have presented no unusual circumstances that would require leniency for their delay.

---

8. The court fully understands that the Timbisha Tribe was recognized only as of January 3, 1983, thereby confining the period of its imputed

knowledge in this litigation to only four years. Even this delay must be found untimely in light of the two other factors discussed below.

They merely have held off their taking claim in the hope that they could obtain title instead. This decision was a calculated gamble on their part; they have made their choice. Now that the proposed intervenors' chances for obtaining title seem to be diminishing, they want to try a different approach. Indeed, the only unusual circumstance present in this case is the entry of final judgment on December 6, 1979; interventions after final judgment must be denied because of the prejudicial effect on the existing parties and because of the waste of judicial resources. *See, e.g., McClain v. Wagner Elec. Corp.*, 550 F.2d 1115, 1120 (8th Cir.1977); *Cheyenne–Arapaho Tribes*, 1 Cl.Ct. at 296. *See generally* 7B C. Wright & A. Miller, *Federal Practice and Procedure* § 1916 (1986).

In sum, the three factors described in *Cheyenne–Arapaho* strongly militate against the proposed intervenors here. This motion for intervention, therefore, must be denied as untimely.

### B.  Adequacy of Representation

■ Although defendant's arguments have been directed solely toward the issue of timeliness, the proposed intervenors also have a problem on the issue of adequacy. Specifically, while this court realizes that proposed intervenors need only make a minimal showing that their rights have been impaired, *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538, 92 S.Ct. 630, 636, 30 L.Ed.2d 686 (1972) (all the applicant must show is that the representation of his interests may be inadequate), they have failed to show that they are so situated. The Te–Moak Bands of Indians and the proposed intervenors share identical interests. *See Bumgarner v. Ute Indian Tribe of Uintah*, 417 F.2d 1305, 1308 (10th Cir.1969) (where all parties have identical interests, there was no intervention as a matter of right). The amount awarded is for all Western Shoshones and is to be shared by each federally recognized tribe. The Te–Moak Bands had the same incentive as the proposed intervenors to achieve a greater award for the Nevada land; the proposed intervenors, then, could not have been so situated as to have had their rights impaired.

Nevertheless, the proposed intervenors argue that their rights were impaired because the Te–Moak Bands have improperly handled their case. In particular, the proposed intervenors allege that the Te–Moak Bands never should have stipulated to the July 1, 1872 Nevada valuation date. This argument must be rejected because the "[m]ere difference of opinion among attorneys is not in itself inadequate representation within the meaning of the Rule [24(a)(2)]. If it were, intervention of right would become almost automatic." *Stadin v. Union Elec. Co.*, 309 F.2d 912, 919 (8th Cir.1962), *cert. denied*, 373 U.S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415 (1963); *accord Bumgarner*, 417 F.2d at 1308.

Relying on *Turtle Mountain of Chippewa Indians v. United States*, 203 Ct.Cl. 426, 490 F.2d 935 (1974), a decision which stated that a tribe's representation only extends to its own members, the proposed intervenors contend that the Te–Moak Bands' representation should apply only to the Bands' own members, and that the Te–Moak Bands' representation should not be used as a reason for denying the proposed intervenors their own separate representation. The problem with that argument is that it already has been presented and squarely rejected in a previous decision under docket number 326–K. *Western Shoshone Legal Defense Fund & Educ. Ass'n*, 209 Ct.Cl. at 60–61, 531 F.2d at 503–04 (this motion came twenty-five years after the original petition was filed). In that decision, the court held that the Te–Moak Bands could represent more than just their own tribal bands, and that the Te–Moak Bands were representative of the Western Shoshone identifiable group as a whole. *Id.* The Court of Claims then held that *Turtle Mountain* did not apply to the Western Shoshone Legal Defense Fund because the intervenors in *Turtle Mountain* "had participated from the beginning and did not seek to enter in circumstances comparable to the late and conflictual situation present ... [before the court.]" *Id.* at 60 n. 18, 531 F.2d at 504 n. 18.

In this case, as in the case docketed under 326–K, the proposed intervenors again have not participated from the beginning and again have entered rather late in the course of litigation. In fact, the attempted entry here is even later than the attempted entry made by the Western Shoshone Legal Defense Fund. Therefore, the proposed intervenors' argument in favor of separate representation must be dismissed under the same rational as that used by the Court of Claims in *Western Shoshone Legal Defense Fund & Educ. Ass'n, supra.*

Finally, the proposed intervenors in this case are not only untimely but also are seeking entry into the wrong case. Despite their protestations to the contrary, they are attempting to undo the Nevada stipulation date agreed upon in 1966. That stipulation, under 326–K, was part of the Western Shoshone taking case against the United States. Final judgment was entered in that case on December 6, 1979, and that case was completely decided as of 1981. The case at bar, under docket number 326–A, is a general accounting claim, which pertains to the trust funds allegedly misused by the United States.

## II. Proposed Intervenors' Due Process Rights

■ The proposed intervenors have asserted that their due process rights will be violated if their motion for intervention is denied. In support of that argument, they contend that res judicata, collateral estoppel, and the class action rules can be applied only within the context of the due process clause of the Fifth Amendment. Whatever the application of the due process clause of the Fifth Amendment in this context, the court must dismiss these arguments as irrelevant. The issue here is not res judicata, collateral estoppel, or whether intervenors can be part of a class action suit; the issue before the court is whether to allow an intervention as a matter of right under RUSCC 24(a)(2).

■ The rules governing motions for intervention require that intervenors must be represented adequately, and, in so doing, encompass the intervenors' due process rights. Indeed, the requirements and standards under RUSCC 24(a)(2) are "primarily an interest test and a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir.1969) (en banc); *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C.Cir.1967). For reasons stated above, the court has determined that the proposed intervenors are adequately represented by the Te–Moak Bands and, accordingly, the requirements of the due process clause of the Fifth Amendment have been met.

■ This court realizes that if the proposed intervenors are not allowed to enter into this case, their claim will be barred permanently due to the statute of limitations under the Indian Claims Commission Act. This preclusion of their claim under the statute of limitations, which only allowed Indian claimants to bring their pre–1946 tribal claims before the Indian Claims Commission between 1946 and 1951, is also not a violation of their due process rights per se. "Statute of limitations affecting existing rights are not unconstitutional, if a reasonable time is given for the commencement of an action before the bar takes effect." *Kentucky Union Co. v. Kentucky*, 219 U.S. 140, 156, 31 S.Ct. 171, 178, 55 L.Ed. 137 (1910) (citing *Terry v. Anderson*, 95 U.S. 628, 633, 24 L.Ed. 365 (1877)). In the present case, the proposed intervenors were given five years by statute, a reasonable time under the standards of the due process clause of the Fifth Amendment.

■ This court, in denying this motion for intervention, also understands that proposed intervenors will not be able to represent themselves exclusively throughout the remainder of this case. Yet, in Indian tribal cases, exclusive representation is not necessary nor is its denial a violation of constitutional rights. All that is required is for the group claim to be put forward by one member of the group. *Western Shoshone Legal Defense & Educ. Ass'n*, 209 Ct.Cl. at 60–61, 531 F.2d at 503–04. This already has been achieved by the Te–Moak Bands. In 1962, the Te–Moak Bands were

given the right to maintain this action for and on behalf of the descendants of the Western Shoshone identifiable group, *Shoshone Indians,* 11 Ind.Cl.Comm. at 446, and the Bands, accordingly, have put forward the group's claim. If the proposed intervenors believed that they were inadequately represented, they should have filed their motion for intervention in 1962, not twenty-five years after the fact.

### III. Suspension in Light of *Dann*

The proposed intervenors alternatively argue that if this court intends to deny their motion the court should suspend that decision pending the outcome of *Dann v. United States* on remand. In *Dann,* the date established for the taking was December 6, 1979, and did not involve the date stipulated in number 326–K. This issue, however, will not be addressed by *Dann* on remand, and therefore a suspension on that basis would be unnecessary.

The proposed intervenors contend, however, that there are relevant issues left in *Dann v. United States* that could alter the outcome of this case. This court does not agree. The only issue left to be decided in *Dann* is whether the Danns' individual land has been taken. The issue that the proposed intervenors seek to change here is the Nevada stipulation date in 326–K, which established the date of the taking of aboriginal title held by the tribe. Because the decision in *Dann* will play no part in the decision to deny this motion for intervention, there is no reason to suspend this order in light of *Dann v. United States.*

### CONCLUSION

This court holds that the motion for intervention must be denied. The court has determined that the proposed intervenors' motion is untimely according to RUSCC 24(a), and that they are adequately represented under RUSCC 24(a)(2). This court also finds that the proposed intervenors' due process rights have not been violated since they are and have been adequately represented under RUSCC 24(a)(2). As for the oral motion to suspend, the court also holds that it, too, must be denied since the

remaining issues in *Dann v. United States* only concern individual Indian claims.

Accordingly, this court denies both the motion for intervention and the proposed intervenors' oral motion for suspension of its decision pending the outcome of *Dann v. United States.*

IT IS SO ORDERED.